**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | | |
|---|---|---|
| FRANCISCO BENITEZ, | ) | |
| | ) | Case No. |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JEROME BOGUCKI, RAYMOND | ) | |
| SCHALK, PAUL ZACHARIAS, LEE | ) | |
| EPLEN, the CITY OF CHICAGO, GAIL | ) | |
| FEIGER, and COOK COUNTY, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| | ) | |

## <u>COMPLAINT</u>

NOW COMES Plaintiff, FRANCISCO BENITEZ, by his attorneys LOEVY & LOEVY,

and complaining of Defendants JEROME BOGUCKI, RAYMOND SCHALK, PAUL

ZACHARIAS, LEE EPLEN, the CITY OF CHICAGO, GAIL FEIGER and COOK COUNTY,

states as follows:

### INTRODUCTION

1.      Plaintiff Francisco Benitez was only 18 years old when he was arrested,

prosecuted, and wrongly convicted of the tragic 1989 shooting of Willaim Sanchez and Prudencio

Cruz. He spent 34 years in prison for a crime he did not commit.

2.      Plaintiff had nothing to do with the murder. Not one piece of physical evidence

connected Plaintiff to the shootings. He had no motive to commit the crime. And he had a

strong alibi, vouched for by two women who were not related to Plaintiff and had no reason to

lie for him.

3.      Instead, Plaintiff's arrest, prosecution, and conviction were based entirely on false evidence purposely manufactured by Chicago Police Detectives Jerome Bogucki and Raymond Schalk, in concert with the other Defendants.

4.      Among the fabricated evidence were two identifications of Plaintiff by two witnesses who never even saw the shooting and got only a fleeting glimpse of a person running by their window after the shooting. In fact, the person that ran by their window was not the perpetrator, but one of the victims stumbling back home after being shot.

5.      In addition, Defendants obtained a false confession from Plaintiff that they extracted through a psychologically abusive interrogation in which they repeatedly rejected Plaintiff's denials and his alibi, threatened him, and eventually promised him that if he signed a statement confessing to a version of events they provided to him, he could go home to his family.

6.      The confession statement was obviously false. It was a bizarre, rambling story that did not comport with the known facts of the crime.

7.      Defendants' promise that Plaintiff would be released if he signed the statement was also false. Instead, they charged Plaintiff with murder.

8.      Plaintiff was convicted based on false and fabricated evidence manufactured by Defendants. He spent the next three decades in prison.

9.      In August 2023, after an extensive evidentiary hearing in the Circuit Court of Cook County in which overwhelming evidence of Plaintiff's innocence was presented, including the identities of the true perpetrators of the crime (who had no relation to Plaintiff whatsoever), Plaintiff's conviction was thrown out and the State dropped all charges.

10. Plaintiff has also been certified as an innocent person by the Circuit Court of Cook County.

11. This is not the first time Defendants Bogucki and Schalk have caused the wrongful conviction of an innocent man. At least two other innocent men have had their convictions thrown out based on the investigative misconduct of these detectives.

12. A civil rights lawsuit filed by one of those men resulted in a jury finding that Defendant Bogucki had violated his constitutional rights, and one of the largest wrongful conviction verdicts in Illinois history.

13. Defendants Bogucki and Schalk were not rogue officers, but part of a culture of misconduct within the Chicago Police Department. These Defendants worked in the Area 5 Detective Division alongside a number of other notorious Chicago Police detectives, including Reynaldo Guevara and Ernest Halvorsen.

14. These Area 5 detectives are collectively responsible for approximately 50 wrongful convictions—so far—resulting in more than 400 years of wrongful incarceration of innocent Chicagoans.

15. Plaintiff now seeks justice for the harm that Defendants have caused and redress for the loss of liberty and the terrible hardship that he has endured and continues to suffer as a result of the Defendants' misconduct.

## JURISDICTION AND VENUE

16. This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

17.     This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. §

1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

18.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial

district. The events and omissions giving rise to Plaintiff's claims occurred within this judicial

district, including the investigation, prosecution, and trial resulting in Plaintiff's conviction.

## PARTIES

19.     Plaintiff Francisco Benitez spent 34 years wrongfully incarcerated for a crime he

did not commit.

20.     At all times relevant to the events described in this Complaint, Defendants

Jerome Bogucki, Raymond Schalk, and Paul Zacharias, and other unknown law enforcement

officers were police officers in the Chicago Police Department, acting under color of law and

within the scope of their employment for the City of Chicago. These Defendants are referred to

collectively as the "Police Officer Defendants" throughout this complaint.

21.     At all times relevant to the events described in this complaint, Defendant Lee

Epplen, and other unknown law enforcement officers supervised the Police Officer Defendants.

These Defendants participated in the misconduct alleged in this complaint and also facilitated,

condoned, approved, and turned a blind eye to the misconduct of the Defendants whom they

supervised.

22.     At all relevant times, Defendant Gail Feiger and unknown Cook County

prosecutors were Assistant Cook County State's Attorneys. Prior to the existence of probable

cause to believe Plaintiff had committed a crime, and while acting in their investigatory

capacity, these Defendants manufactured and fabricated coerced confessions and statements

from Plaintiff and other witnesses, and they worked to maliciously prosecute Plaintiff for the

Cruz and Sanchez murders. These Defendants are referred to collectively as the "Prosecutor Defendants" throughout this complaint.

23.     The City of Chicago is an Illinois municipal corporation that is or was the employer of the above-named Defendants. Each of the Defendants named in this Complaint acted during their investigation of the Cruz and Sanchez murders as agents or employees of the City of Chicago. The City of Chicago is liable for all torts committed by the Defendants pursuant to the doctrine of *respondeat superior*. Additionally, the City of Chicago is responsible for the policies and practices of the Chicago Police Department.

24.     Defendant Cook County is a governmental entity within the State of Illinois, which consists in part of its Cook County State's Attorney's Office and was at all relevant times the employer of the Prosecutor Defendants. Defendant Cook County is a necessary party to this lawsuit.

25.     Each and every individual Defendant, known and unknown, acted under color of law and within the scope of his employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his individual capacity unless otherwise noted.

## FACTS

### The Crime

26.     On the night of April 28, 1989, at approximately 8:45 p.m., William Sanchez and Prudencio Cruz were walking north from their home at 1243 N. Harding Ave. to the corner store.

27.     As they were walking north on Harding, just a few doors away from their homes, someone walked south from the corner of Potomac and Harding and shot at the two boys.

28.     William Sanchez died almost immediately from a gunshot wound to the head, in front of 1253 N. Harding.

29.     Prudencio Cruz was shot in the right side of his chest. After being shot, he went back south, making it to the front steps of his family home at 1243 N. Harding, where his body was found.

30.     Cruz and Sanchez were just 14 years old. Their deaths are a profound tragedy.

**Initial Investigation**

31.     Moments before the shooting, two Chicago police officers encountered a group of four or more members of the ULOGs, the street gang that controlled that neighborhood, hanging out on the corner of Potomac and Harding. The officers told the group to disperse, and then drove away.

32.     The shooting occurred moments later. In fact, the officers were close enough that they heard the shooting and returned to the scene to find both the bodies.

33.     When police canvassed the scene, they could not find anyone who actually witnessed the shooting.

34.     Two of the ULOGs the police had just dispersed told officers that they heard "Cookie" and "Fat Johnnie" might have had something to do with the shooting.

35.     Plaintiff has never gone by either of those names, was not from that neighborhood, and has no affiliation with the ULOGs.

36.     Mildred Cotto and Hipolito Rosado, who lived at 1247 N. Harding Ave, were eating dinner when they heard the gunshots, rushed to their window, and saw someone running southbound on Harding. They did not see the actual shooting, and they did not see the person running south with a gun.

37.     When Cotto and Rosado spoke to officers shortly after the shooting, they were only able to provide a basic description of the person they saw run by their window, but could not identify any distinct or distinguishing features. They did not tell police that the person they saw running by ever stopped, or that he looked their way, which was the only way they would have been able to actually see the shooter's face.

38.     Indeed, given the circumstances of the shooting—occurring late at night, with dim street lighting, a viewing opportunity of just seconds to see a person running down the street past their window—Cotto and Rosado could not possibly or reliably identify any one person as being the person they saw run past their window.

39.     In sum, police investigators had early investigative leads pointing in two directions: (a) toward the ULOGs that had been on the corner just before and after the shooting; and (b) toward Cookie and Fat Johnnie (a lead that came from the ULOGs who had been at the corner). None of these leads pointed toward Benitez.

### A Gang Crimes Officer Investigating Cookie's Involvement in the Crime Uses Benitez's Photo as a "Filler"

40.     Veteran Gang Crimes Officer Joseph Sparks learned of the lead that Cookie was the perpetrator. Sparks knew Cookie and considered him a viable suspect in the shooting.

41.     The day after the shooting, Sparks created a photo array in which he included a picture of Cookie as his suspect.

42.     In order to create a fair photo array, Sparks needed "fillers," *i.e.*, photos of other individuals who were not suspects, but who had features sufficiently similar to the suspect (Cookie) and the witness descriptions in order to create a fair photo array.

43.     Sparks included a picture of Plaintiff in the photo array as one of those fillers.

44.     Sparks did not include Plaintiff in the photo array because he thought he was a suspect, or because he thought Plaintiff committed the crime.

45.     To the contrary, Sparks knew Plaintiff, and had interacted with him over the years. Sparks thought Plaintiff was a good kid and did not believe Plaintiff was the type of person who would commit such a crime.

46.      After selecting the picture of Plaintiff and others to include in the photo array as fillers, Sparks showed the photo array to Cotto, the witness who had seen the shooter run by her window. Instead of identifying Sparks' suspect, Cookie, the witness made a false identification: she identified Plaintiff, a mere filler.

47.     That Cotto identified one of the fillers in the photo array further demonstrated that Cotto did not, and could not, get a good look at the person running by her window.

48.     Indeed, witnesses often fail to identify a police suspect, and instead identify a filler. In studies of eyewitness memory, filler identifications are understood to be false identifications. They are an indication that the witness is not able to make a reliable identification and may instead be guessing.

49.     Unable to get an identification of Cookie, the police investigation stalled.

50.     Meanwhile, despite the fact that the shooting occurred just moments after a group of ULOGs were told to disperse from the corner, the Police Officer Defendants, under the supervision of Defendant Epplen, failed to conduct any investigation into the possible involvement of the ULOGs in the shooting.

**Defendants Bogucki and Schalk Decide to Rewrite History, Falsely Claiming Plaintiff Had Been a Suspect All Along**

51.     Defendants Bogucki and Schalk, rather than pursue promising leads regarding the ULOGs, decided to frame Plaintiff instead.

8

52.     They wrote a police report falsely claiming that Plaintiff had been a suspect all along. They created a false narrative in which Cotto's photo array identification of Plaintiff, a *filler*, was actually an accurate identification of the police *suspect*.

53.     Armed with this fabricated evidence, and Cotto's earlier mistaken identification of Plaintiff's picture, Defendants Bogucki and Schalk conducted lineups in which they got Cotto and Rosado to falsely identify Plaintiff as the person they saw run past their window.

54.     Those identifications were false—Plaintiff had not been involved in the crime, or even in that neighborhood.

55.     The identifications were the product of manipulation and coercion by Defendants Bogucki and Schalk in order to frame Plaintiff for a crime he did not commit.

56.     Defendants Bogucki and Schalk wrote false police reports documenting their fabricated photo array identification and lineup identifications. Those false reports were prepared under the supervision of, and approved by, Defendant Epplen.

57.     To this day, Gang Crimes Officer Sparks maintains that he does not believe Plaintiff committed the crime, and that he has always felt the police got the wrong guy.

### Defendants Ignore Plaintiff's Repeated Denials, and His Confirmed Alibi, Instead Obtaining a False Confession by Force

58.     Knowing they needed more, on the afternoon of August 29, 1989, Defendants had Plaintiff arrested and brought in for questioning.

59.     Defendants Bogucki and Schalk interrogated Plaintiff about the crime. Plaintiff told Defendants the truth: he was not involved in the shooting, and he knew nothing about the crime or who committed it.

60.     Plaintiff also provided Defendants with an alibi for his whereabouts. He had been at the home of a woman named Tomasa, who he affectionately referred to as his "Aunt,"

and was someone he would occasionally help with her daily needs and spend time with at her house.

61.     Plaintiff explained that on the night of the shooting, just a day earlier, he had received a check from work, gone to the mall with a friend and purchased various items, and then spent the evening at Tomasa's house with her and her daughter.

62.     Plaintiff was able to provide receipts that showed he had been at the mall.

63.     Defendants also learned that Tomasa confirmed Plaintiff's alibi.

64.     To this day, Tomasa and her daughter maintain that Plaintiff had been with them that night, despite more than three decades of not speaking to or seeing Plaintiff.

65.     Defendants Bogucki and Schalk ignored Plaintiff's repeated denials, and the evidence that Plaintiff's alibi was confirmed by individuals who had no incentive to lie for him. They were hell-bent on charging Plaintiff and closing their case.

66.     Defendants continued their interrogation, and Plaintiff continued to deny any involvement in the crime.

67.     When Defendant Feiger, the Assistant State's Attorney assigned to the case, interviewed Plaintiff that night, he continued to deny any involvement and provided the same alibi that he had repeatedly provided to Defendants Bogucki and Schalk.

68.     Defendant Feiger did not take a statement or otherwise document Plaintiff's several denials or alibi, despite the many hours he had already been in police custody.

69.     Defendants Bogucki and Schalk then continued to interrogate Plaintiff overnight, applying increasingly coercive tactics.

70.     Defendants Bogucki and Schalk ignored his repeated denials of any involvement in the crime, calling him a liar over and over.

71.    Defendants Bogucki and Schalk brandished a flashlight menacingly during the interrogation, as though Plaintiff was going to be hit if he did not cooperate.

72.    Defendants Bogucki and Schalk kept Plaintiff in a locked interrogation room all night, without sleep.

73.    Defendants Bogucki and Schalk refused his requests to speak to his mother.

74.    Defendants Bogucki and Schalk fed him facts of the crime, which they would later deny and instead use to claim that Plaintiff's confession was legitimate.

75.    And finally, Defendants Bogucki and Schalk falsely promised Plaintiff that if he agreed to sign a statement admitting to the shooting, but claiming he did it in self-defense, he would be released.

76.    Early the next morning, after many more hours of interrogation and experiencing the coercive tactics above, Plaintiff's will was finally broken. He was scared, afraid, and exhausted. In the hope that Defendants Bogucki and Schalk would keep their promise and he would go home if he did what they wanted, Plaintiff agreed to sign a statement parroting the story Defendants Bogucki and Schalk fed him.

77.    Defendants Bogucki and Schalk called Defendant Feiger back to Area 5 to again interview Plaintiff and to get him to sign a false statement implicating himself in the crime.

78.    Defendant Feiger wrote out the false statement and had Plaintiff sign it.

79.    Defendants Bogucki, Schalk and Feiger worked together cooperatively and in coordination to obtain the false statement from Plaintiff.

80.    Defendant Feiger actively participated as an investigator with the Police Officer Defendants in the creation of Plaintiff's false statement incriminating himself, which he was

forced to sign. Defendant Feiger met with Defendants Bogucki and Schalk before taking Plaintiff's statement and knew the story they wanted Plaintiff to say.

81.     Indeed, the false statement taken by Defendant Feiger simply repeated what Defendants Bogucki and Schalk had told Plaintiff to say.

82.     In fact, the statement attributed to Plaintiff consisted of Defendant Feiger walking Plaintiff through Defendants' version of events to have Plaintiff confirm that version of events. It was not an interview designed to get to the truth.

83.     The story Defendants Bogucki, Schalk and Feiger walked Plaintiff through was bizarre and entirely contrary to the crime scene evidence and known facts about the crime. Crime scene and forensic evidence, among other things, made the story demonstrably false.

84.     Defendant Feiger simply disregarded the evidence that clearly showed that Plaintiff's confession was false. Defendant Feiger also knew that Plaintiff had denied any involvement in the crime when she had interviewed him the night before, and that his bizarre confession was coming only after a whole night of additional interrogation by Defendants Bogucki and Schalk.

85.     She continued her interview of Plaintiff with the specific purpose of obtaining a false, incriminating statement from him.

86.     Plaintiff's statement—obtained by violence and psychological coercion and manufactured by Defendants—was used to prosecute and convict Plaintiff for a crime he did not commit.

87.     Defendant Zacharias joined the other Defendants' efforts to frame Plaintiff for a crime he did not commit.

88.     In order to further implicate Plaintiff in the crime, and to corroborate the fantastical, false confession Defendants had obtained from him, Defendant Zacharias agreed to falsely claim that he went with Plaintiff to an alley near the shooting so that Plaintiff could show him where he discarded the murder weapon.

89.     That never happened. Defendant Zacharias made it up.

90.     No gun was ever recovered.

91.     Defendants suppressed at all times the coercive techniques they used to obtain Plaintiff's statement. In addition, they suppressed that they had fabricated his statement.

92.     In addition, Defendants Bogucki and Schalk wrote a false closing report regarding their investigation, lying about how Plaintiff came to be implicated in the crime, the corroboration of Plaintiff's alibi, and the coercive tactics they used to secure Plaintiff's false confession.

93.     The false report was prepared under the supervision of, and approved by, Defendant Epplen.

**Evidence About the Real Killers**

94.     In fact, the real killers were Mickey and Mono, two members of the ULOGs—whose members had been seen at the corner by police just moments before the shooting.

95.     On the night of the shooting, two brothers, A.R. and S.G.[1], had been at their house a few doors down from where the shooting occurred. They were seated in the front window of their upstairs apartment and saw the whole thing.

96.     They watched as Mickey and Mono walked south toward the two victims, who were walking north.

---

[1] The names are abbreviated to protect the privacy of third parties.

97.     A.R. and S.G. saw Mickey pull out a gun and shoot the two boys.

98.     Mickey then handed the gun to Mono, and they fled north on Harding.

99.     A.R. and S.G. knew Mickey and Mono and immediately recognized them. They saw Mickey and Mono in the neighborhood regularly and had even seen them outside earlier that day.

100.    Later, Mono even admitted to A.R. that Mono and Mickey had committed the crime. Mono said that he had seen A.R. in the window and knew he saw the shooting.

101.    A.R. and S.G. did not tell police what they had seen. They were both young at the time of the shooting, and afraid that if they ever said anything they would be killed by the ULOGs. Their mother even told them not to tell anyone for their own safety.

102.    For years, A.R. and S.G. did not know that Plaintiff, or anyone, was ever convicted of the crime.

103.    When they found out that Plaintiff had been in prison for decades for the crime, they came forward with the truth.

104.    Based on the information provided by A.R. and S.G., the identifications made by Cotto and Rosado were obviously false. The shooters fled north after the shooting, and so the person who went south past Cotto and Rosado's window was not the perpetrator.

105.    Instead, the person Cotto and Rosado had seen going south past their window was one of the victims, Prudencio Cruz, the only person who definitively traveled south to the front steps of his home after the shooting.

106.    Cruz even matched the initial description Cotto and Rosado had given to the police.

14

107.    In addition, based on the information provided by A.R. and S.G., Plaintiff's confession was obviously false, and the product of Defendants' unlawful coercion.

**Plaintiff's Wrongful Conviction and Imprisonment**

108.    As a result of the Defendants' misconduct and based on the false evidence described in this Complaint, Benitez was arrested, prosecuted, and convicted of murder.

109.    There was no physical evidence of any kind linking Plaintiff to the crime.

110.    The case against Plaintiff was based entirely on the false and fabricated evidence discussed above, including Plaintiff's false confession, which was published to the jury.

111.    At his criminal trial, Plaintiff took the stand, maintaining his absolute innocence and testifying to Defendants' misconduct.

112.    Without the false statements and confession Defendants created, and their suppression of evidence of Plaintiff's innocence, Plaintiff would have never been convicted.

113.    Instead, Plaintiff was found guilty of all charges. The State sought the death penalty.

114.    Plaintiff was spared the death penalty and was sentenced to life in prison.

115.    Plaintiff was just 18 years old at the time of his arrest. The following decades of his life were consumed by the horror of wrongful imprisonment.

116.    Because of the Defendants' misconduct, Plaintiff's opportunity to grow older with his family and make a life with them was taken away. Plaintiff's relationships with his family were severely harmed. He could not have and raise children.

117.    Plaintiff was stripped of his young adulthood and deprived of opportunities to gain an education, to engage in meaningful labor, to develop skills and a career, and to pursue his interests and passions.

118.    Plaintiff has been deprived of all the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being. He never knew whether the truth would come out or if he would ever be exonerated.

119.    Plaintiff spent decades in prison before being released. In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, the Defendants' misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, rage, and other physical and psychological effects.

120.    Plaintiff was branded a murderer. He has suffered profound reputational harm as a result.

### Plaintiff's Exoneration

121.    Benitez never stopped fighting to prove his innocence, even after his conviction.

122.    In June 2022, Plaintiff filed a Petition for Post-Conviction Relief. His Petition included signed affidavits from A.R. and S.G. and presented evidence of Defendants Bogucki and Schalk's misconduct in this case and others.

123.    On August 29, 2023, after an evidentiary hearing to consider Plaintiff's Petition and the evidence of his innocence, the Cook County Circuit Court vacated Plaintiff's conviction on the grounds of actual innocence.

124.    The State entered a motion of *nolle prosequi* and dismissed all charges against Plaintiff.

125.    On December 7, 2023, Plaintiff received a certificate of innocence from the State of Illinois.

126.    At the time of his exoneration, Plaintiff had been wrongfully imprisoned for more than 34 years. He had spent almost two-thirds of his life in prison as an innocent man.

### Chicago's Policy and Practice of Wrongly Convicting Innocent Persons in Violation of the Constitution

127.    The City of Chicago and the Chicago Police Department are responsible, by virtue of their official policies, for inflicting miscarriages of justice in scores of criminal cases like the one endured by Plaintiff.

128.    Since the 1980s, more than a hundred cases have come to light in which Chicago police officers fabricated false evidence and/or suppressed exculpatory evidence in order to cause the convictions of innocent persons for serious crimes they did not commit.

129.    These cases include many in which Chicago police officers used the same tactics that Defendants employed against Plaintiff in this case, including but not limited to fabricating evidence, concealing exculpatory evidence, coercing confessions and statements through physical and psychological abuse, manipulating witnesses in order to influence eyewitness identifications and testimony, and using other tactics to secure the arrest, prosecution, and conviction of a person without probable cause and without regard for the person's actual guilt or innocence.

130.    At all relevant times, members of the Chicago Police Department, including the Defendants in this action, routinely fabricated and manipulated identification procedures to procure suspect identifications that they knew to be inaccurate.

131.    At all relevant times, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the Chicago Police Department and

never disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

132.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

133.    The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of, inter alia, *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, No. 87 C 2536 (N.D. Ill.).

134.    The policies and practices of file suppression at issue in *Fields* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the investigation at issue here.

135.    In addition, a set of clandestine files related to Area Five homicides—the same Detective Division involved in this case—was found in the case of *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.). Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

136.    The policy and practice of suppressing exculpatory and/or impeaching material evidence was alive and well at all relevant times, including at the Area Five Detective Division during the investigation at issue here.

137.    In addition, the City of Chicago and the Chicago Police Department routinely used illegal tactics, including torture, physical coercion, and psychological coercion, to extract

involuntary and false confessions and statements from suspects and witnesses. There are well over 250 documented cases of Chicago Police officers using torture and coercion to illegally obtain confessions in homicide cases. The City had notice of this widespread practice of procuring false and coerced confessions long before the events at issue in this case.

138.    This history goes back at minimum to the 1980s and has continued well into the 2000s and includes the conduct of infamous Chicago Police Detectives including Jon Burge, Michael McDermott, Kenneth Boudreau, Kriston Kato, and many others. In many cases, these and other Chicago Police officers have been the subject of judicial determinations that they engaged in a pattern and practice of using physical and psychological abuse to coerce false confessions from suspects, and/or the exonerations resulted from DNA evidence proving the confessions were false, and/or the exonerations resulted in the State of Illinois certifying that the individual was innocent despite an earlier false confession.

139.    Moreover, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

140.    Prior to and during the period in which Plaintiff was falsely charged and convicted, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

141.    For instance, Defendants Bogucki, Schalk, and Zacharias worked with infamous Chicago Police officers including Reynaldo Guevara, responsible so far for more than forty overthrown wrongful convictions, and Joseph Miedzianowski, who is now serving a life sentence in federal prison for his role as leader of a criminal drug enterprise operated out of the Chicago Police Department.

142.    Multiple witnesses have come forward with evidence that detective Guevara used his status as a detective to advance the criminal drug enterprise he participated in with Miedzianowski, and to pressure drug dealers that did not do their bidding. Guevara's assistance included working with Miedzanowski to pin murders on innocent men.

143.    In the case of *Klipfel v. Bentsen*, No. 94 C 6415 (N.D. Ill), a federal jury in Chicago returned a *Monell* verdict against the City, finding that the City was responsible for maintaining a code of silence and a deeply flawed disciplinary system that allowed Chicago police officers (operating out of the very same police facilities as the Defendant Officers in this case) to operate a far-reaching, long-running criminal enterprise that included the subversion of homicide investigations.

144.    The *Klipfel* plaintiffs were two former federal agents from the Bureau of Alcohol, Tobacco and Firearms who brought allegations of rampant criminal misconduct among Gang Crimes officers to the attention of CPD officials. The evidence in that litigation included: Philip Cline, an Area Commander and future Chief of Detectives and Superintendent, personally filed two Internal Affairs complaints against Miedzianowski for tampering in homicide investigations, that resulted in no discipline whatsoever; and that Raymond Risley, an assistant deputy superintendent and head of Internal Affairs, not only knew about misconduct

20

in homicide cases but actively participated in efforts to subvert the disciplinary investigation into Miedzianowski that was at the heart of the Klipfel litigation.

145.     As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department, which has been acknowledged by leaders of the Chicago Police Department and elected officials in Chicago. In accordance with the code of silence, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

146.     The Code of Silence is so pervasive that, as in this case, it often involves other law enforcement officers and agencies, like the Felony Review Unit of the Cook County State's Attorney's Office.

147.     As a result of the City of Chicago's established practices, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse circumstances. The practices that enable this belief include failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

148.     By way of example, Area 5 detective Reynaldo Guevara—who worked alongside Defendants Bogucki and Schalk for years—has a long history of engaging in the kind

of investigative misconduct that occurred in this case. There are dozens of known cases in which Guevara and other Chicago police officers engaged in serious investigative misconduct similar to that described above. They engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

149.    As of the filing of this complaint, more than forty men and women have had their convictions thrown out because of Defendant Guevara's misconduct. They are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Arturo DeLeon-Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, Geraldo Iglesias, Demetrius Johnson, David Gecht, Richrd Kwil, Ruben Hernandez, Juan Hernandez, Rosendo Hernandez, Ray Munoz, David Lugo, Carlos Andino, Daniel Rodriguez, Jaime Rios, Jose Cruz, Marilyn Mulero, Nelson Gonzalez, Johnny Flores, Adolfo Rosario, Eruby Abrego, Jeremiah Cain, Edwin Davila, Alfredo Gonzalez, Gamalier Rivera, Madeline Mendoza, Louis Robinson and John Martinez. These men and women served hundreds of years in prison for crimes they did not commit.

150.    The long history of misconduct Guevara has been found to have engaged in is precisely the same kind of investigative misconduct that occurred in this case, including obtaining false eyewitness identifications through manipulated identification procedures, manipulating witnesses, fabricating evidence, suppressing exculpatory evidence, and coercing false confessions and false statements from suspects and witnesses using physical and psychological violence, all in the course of maliciously prosecuting innocent persons

151.    Given this extensive history of misconduct and the City of Chicago's failure to meaningfully supervise or discipline officers like Guevara and others, it is apparent that Defendants engaged in such misconduct because they had every reason to believe that the City of Chicago and its Police Department condoned such behavior.

152.    The City of Chicago and its Police Department also failed in the years prior to the Plaintiff's wrongful conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

  a.  The conduct of live lineup, photographic, and other identification procedures.

  b.  The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

  c.  The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

  d.  The risks of wrongful conviction and the steps police officers should take to minimize risks.

  e.  The risks of engaging in tunnel vision during investigation.

  f.  The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

153.    The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Plaintiff's wrongful conviction and his injuries.

154.    The City's failure to train, supervise, and discipline its officers, including the Police Officer Defendants, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and de facto policies, as alleged above.

155.    The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

156.    The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

157.    The policy and practice of the City of Chicago is so well-established that it has important ramifications for misconduct in the Felony Review Unit ("FRU") of the Cook County State's Attorney's Office, which often includes young attorneys who are part of the investigation in CPD Detective Divisions and work alongside police officers. As a consequence, the misconduct and coordination between the Defendant Officers and Defendant Feiger during the investigation in this case was not unique or isolated. Instead, members of the FRU as a matter of widespread custom and practice, routinely facilitate and cooperate in fabricating and coercing confessions from suspects in the custody of the Chicago Police Department and then fail to disclose exculpatory evidence to attorneys in their own Trial Division.

158.    The manner in which the CCSAO staffs the Felony Review Unit also reinforces systemic and symbiotic misconduct. In particular, the CCSAO typically staffs the FRU with new, young prosecutors. Those prosecutors are quickly taught that they have to be "team players" and go along with the actions of the CPD Detectives, even if their actions involve misconduct. The FRU attorneys know that their time in the unit has the potential to "make or break" their careers, giving them an incentive to go along with the Detectives, because performance in the FRU is a steppingstone to getting to the Trial Division of the SAO.

159.    Then, by the time young prosecutors get into the Trial Division, who need to secure convictions to get promoted, prosecutors have little opportunity or incentive expose police misconduct, even when they see it, because doing so will make police officers unwilling to serve as witnesses in their cases because they are not "team players," and would potentially expose their own misconduct.

**Defendants Bogucki and Schalk's History of Framing Innocent Persons**

160.    This is not the first case in which Defendants Bogucki and Schalk were found to have engaged in misconduct during the course of a homicide investigation. Instead, they acted consistently with the pattern of misconduct discussed above, which occurred persistently within the Chicago Police Department generally, and Area 5 specifically.

161.    By way of example, Defendant Bogucki has been found liable by a federal jury for framing 13-year old Thaddeus Jimenez for a murder by suppressing evidence related to Defendants Bogucki and Schalk's manipulation of eyewitness identifications. Indeed, after the jury's verdict finding him liable, Defendant Bogucki admitted to his misconduct under oath.

162.    The testimony about investigative misconduct in *Jimenez* is extensive, and appalling:

a.    Larry Tueffel testified that Bogucki and Schalk yelled at him and forced him to identify Jimenez. 13-year old Tueffel was taken to the police station at 3 a.m., where he made clear that the shooter was not Jimenez. When Larry refused to implicate Jimenez, detectives Bogucki and Schalk threatened to arrest Larry and send him to jail. They continued to badger him and tell him he was a liar until he finally gave up from exhaustion and agreed to falsely implicate Jimenez.

b.    Tina Elder, another witness, testified that Bogucki and Schalk showed her two photographs when they brought her into the police station: one of the dead victim, and another of Jimenez. When Bogucki and Schalk showed her these photographs, they told her that Thaddeus Jimenez was their primary suspect, thereby tainting the line-up they later conducted.

c.    Two to three days after the murder for which Jimenez was later wrongly convicted, a person named Juan Carlos was secretly tape-recorded confessing to the murder. This tape was then given to Bogucki and Schalk by a defense lawyer for one of the suspects. Instead of properly investigating this confession, Bogucki and Schalk declined to take any genuine steps to investigate Juan Carlos's confession, and they never logged the tape recording into evidence.

163.    Based on the ample evidence of Bogucki and Schalk's misconduct, Jimenez was awarded $25 million by a federal jury. That verdict was upheld on appeal. *See Jimenez v. City of Chicago*, 732 F.3d 710, 712 (7th Cir. 2013).

164.    In addition, Bogucki and Schalk led the investigation of a 1990 shooting that resulted in the wrongful conviction of James Fletcher. Fletcher's conviction was thrown out on October 25, 2019, when his habeas corpus petition was granted by a federal district judge. The Attorney General's Office chose not to appeal the decision, and the Cook County State's Attorney's Office dropped all charges on January 30, 2020.

165.     Detectives Bogucki and Schalk's misconduct during the course of that investigation included the following:

a.     Emmett Wade was an eyewitness to the shooting for which Fletcher was convicted. When he was interviewed by Bogucki and Schalk, he was shown a single photograph of Fletcher. The detectives told Wade that the man in the photograph was a "bad guy" they wanted to keep off the street. Despite pressure, Wade did not identify Fletcher. This exculpatory information—an eyewitness to the crime did not identify Fletcher—was omitted from Bogucki and Schalk's police reports and deliberately concealed.

b.     Eyewitness Sheenee Friend was interviewed by Bogucki and Schalk while in custody for a parole violation on March 9, 2002. At the interview, she was shown a photo-array. When asked to identify the person who killed the victim, Friend pointed to someone other than Fletcher. In response, Bogucki and Schalk moved her finger to Fletcher's photo and told her that was who did it. The detectives also told Friend that Fletcher was a bad, violent man, that needed to be kept off the streets. The unlawful tactics used with Friend were not included in police reports and deliberately concealed by Bogucki and Schalk.

c.     When eyewitness Edward Cooper was interviewed by Bogucki and Schalk, he was shown a photo-array which contained a photograph of Fletcher. Cooper told the detectives that he did not recognize anyone in the pictures. But Bogucki and Schalk wrote a false police report concealing this information, and instead stated that Cooper made a tentative identification of Fletcher as the perpetrator.

166.     In her ruling, the Honorable Rebecca Pallmeyer of the United States District Court for the Northern District of Illinois wrote that the sworn statements of eyewitnesses Wade, Friend and Cooper about Bogucki and Schalk's misconduct were "highly troubling,"

27

and noted that they were so "particularly in light of the misconduct for which Detective Schalk was charged and Detective Bogucki was found liable in *Jimenez v. City of Chicago*.

167.    Finally, Defendant Bogucki was accused of physically coercing Corky Terry into a false confession in 2002. Bogucki interrogated Terry, during which Terry repeatedly denied all involvement in the shooting. Bogucki then physically abused Terry until he agreed to give a videotaped statement admitting he committed the shooting. This physical abuse included kicking, punching, grabbing by the hair, and hitting Terry with a phonebook.

168.    Defendants never received discipline from the City of Chicago or the Chicago Police Department for any of the conduct set out above.

169.    In fact, the City of Chicago failed to supervise or discipline its police officers, including Defendants. Defendants engaged in the misconduct set forth in this complaint because they knew that the City of Chicago and its Police Department tolerated and condoned such conduct.

## COUNT I
### 42 U.S.C. § 1983 – Due Process
### (Fourteenth Amendment)

170.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

171.    As described in detail above, the Police Officer Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

172.    In the manner described more fully above, the Police Officer Defendants fabricated witness statements falsely implicating Plaintiff in the crime.

173.    The Police Officer Defendants knew this evidence was false.

174. The Police Officer Defendants obtained Plaintiff's conviction using this false evidence, and they failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case.

175. The Police Officer Defendants procured supposed eyewitness identifications of Plaintiff, which they knew to be false and unreliable, using unduly suggestive procedures. Despite this, they caused these identifications to be used during Plaintiff's criminal trial.

176. In addition, the Police Officer Defendants deliberately withheld exculpatory evidence from state prosecutors, Plaintiff, and Plaintiff's criminal defense attorneys, including evidence that they had manufactured false identifications of Plaintiff, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

177. In addition, based upon information and belief, the Police Officer Defendants concealed, fabricated, and destroyed additional evidence that is not yet known to Plaintiff.

178. The Police Officer Defendants' misconduct resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

179. The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

180. As a result of the Police Officer Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

29

181.     The misconduct described in this Count was undertaken pursuant to the policies

and practices of the City of Chicago and the Chicago Police Department, in the manner more

fully described below in Count VI.

## COUNT II
### 42 U.S.C. § 1983 – Coerced and False Confession
### (Fifth and Fourteenth Amendments)

182.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

183.     In the manner described more fully above, the Police Officer Defendants and the

Prosecutor Defendants, acting as investigators and without probable cause to suspect Plaintiff

of any crime, individually, jointly, and in conspiracy with one another, and others unknown, as

well as under color of law and within the scope of their employment, forced Plaintiff to make

false statements involuntarily and against his will, which incriminated him and which were

used against him in criminal proceedings, in violation of his rights secured by the Fifth and

Fourteenth Amendments.

184.     In addition, the Police Officer Defendants and the Prosecutor Defendants, acting

as investigators and without probable cause to suspect Plaintiff of any crime, individually,

jointly, and in conspiracy with one another, as well as under color of law and within the scope

of their employment, used extreme psychological coercion in order to force Plaintiff to

incriminate himself falsely and against his will in a crime he had not committed, in violation of

his right to due process secured by the Fourteenth Amendment. This misconduct was so severe

as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any

conceivable governmental interest.

185.     In addition, these Defendants, acting as investigators and without probable cause

to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, as

well as under color of law and within the scope of their employment, fabricated a false confession, which was attributed to Plaintiff and used against Plaintiff in his criminal proceedings, in violation of Plaintiff's right to a fair trial protected by the Fourteenth Amendment.

186.    Specifically, these Defendants conducted, participated in, encouraged, advised, and ordered an unconstitutional interrogation of Plaintiff, using unlawful coercion, which overbore Plaintiff's will, and resulted in him making involuntary statements implicating himself in the murder of Sanchez and Cruz.

187.    Those false incriminating statements were wholly fabricated by these Defendants and attributed to Plaintiff. Those false incriminating statements were used against Plaintiff to his detriment throughout his criminal case. They were the reason that Plaintiff was prosecuted and convicted of the Cruz murder.

188.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

189.    As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

190.    The misconduct described in this Count by the Police Officer Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT III**
**42 U.S.C. § 1983 – Malicious Prosecution and Unlawful Detention**
**(Fourth and Fourteenth Amendments)**

191.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

31

192.     In the manner described above, the Police Officer Defendants and the Prosecutor Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

193.     In so doing, these Defendants maliciously prosecuted Plaintiff and caused Plaintiff to be deprived of his liberty without probable cause and to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

194.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

195.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

196.     The misconduct of the Police Officer Defendants described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT IV**
**42 U.S.C. § 1983 – Failure to Intervene**

197.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

198.     In the manner described above, during the constitutional violations described herein, one or more of the Police Officer Defendants and the Prosecutor Defendants stood by

without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

199.     These Defendants had ample, reasonable opportunities as well as the duty to prevent this harm but failed to do so.

200.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

201.     As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

202.     The misconduct of the Police Officer Defendants described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT V**
**42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights**

203.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

204.     In the manner described more fully above, the Police Officer Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to fabricate evidence and to detain, prosecute, and convict Plaintiff for the Cruz shooting, regardless of Plaintiff's guilt or innocence, and thereby to deprive him of his constitutional rights.

205.     In so doing, these co-conspirators agreed to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

33

206.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

207.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

208.     As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

209.     The misconduct of the Police Officer Defendants described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT VI**
**42 U.S.C. § 1983 – Policy and Practice Claim against the City of Chicago**

210.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

211.     As described in detail above, the City of Chicago is liable for the violation of Plaintiff's constitutional rights because Plaintiff's injuries were caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

212.     At all times relevant to the events described in this complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: conducting photographic and live lineup procedures by officers and agents of the Chicago Police Department and City of Chicago; the conduct of interrogations and questioning of criminal suspects; the collection, documentation, preservation, testing, and disclosure of evidence; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of

34

investigative files and disclosure of those files in criminal proceedings. In addition, or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to these subjects.

213.    These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the Defendants.

214.    In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, such as Plaintiff, were routinely deprived of their right to due process. For instance, it was common that suspects were prosecuted based on fabricated evidence, including fabricated eyewitness identifications and eyewitness identifications obtained using manipulated photographic or live lineup procedures.

215.    Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects  were coerced to involuntarily implicate themselves by various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to

lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

216.    In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain or preserve evidence or destroyed evidence; and (5) officers pursued wrongful convictions through profoundly flawed investigations.

217.    These widespread practices, individually and together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

218.    The above widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, individually and together,

because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

219.    As a result of the policies and practices of the City of Chicago, numerous individuals have been wrongly convicted of crimes that they did not commit.

220.    In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

221.    Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT VII
## State Law Claim – Malicious Prosecution

222.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

223.    In the manner described above, the Police Officer Defendants and the Prosecutor Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

224.    In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

37

225.    The judicial proceedings were terminated in Plaintiff's favor and in a manner indicative of his innocence when his conviction was vacated and charges against him were dropped in September 2023.

226.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

227.    As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### COUNT VIII
### State Law Claim – Intentional Infliction of Emotional Distress

228.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

229.    The actions, omissions, and conduct of the Police Officer Defendants and the Prosecutor Defendants as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

230.    As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### COUNT IX
### State Law Claim – Willful and Wanton Conduct

231.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

232.    At all times relevant to this complaint the Police Officer Defendants and the Prosecutor Defendants had a duty to refrain from willful and wanton conduct in connection with the Cruz murder investigation.

233.    Notwithstanding that duty, these Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

234.    As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT X**
**State Law Claim – Civil Conspiracy**

235.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

236.    As described more fully in the preceding paragraphs, the Police Officer Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

237.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

238.    The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

239.   The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

240.   As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT XI
### State Law Claim – *Respondeat Superior*

241.   Plaintiff incorporates each paragraph of this complaint as if fully restated here.

242.   While committing the misconduct alleged in the preceding paragraphs, the Police Officer Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

243.   Defendant City of Chicago is liable as principal for all torts committed by its agents.

## COUNT XII
### State Law Claim - Indemnification

244.   Plaintiff incorporates each paragraph of this complaint as if fully restated here.

245.   Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

246.   The Police Officer Defendants were employees, members, and agents of Defendant City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

247.   Defendant City of Chicago is responsible to pay any judgment entered against the Police Officer Defendants.

248.     The Prosecutor Defendants were employees, members, and agents of Defendant Cook County, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

249.     Defendant Cook County is responsible to pay any judgment entered against the Prosecutor Defendants.

WHEREFORE, Plaintiff FRANCISCO BENITEZ, respectfully requests that this Court enter a judgment in his favor and against Defendants JEROME BOGUCKI, RAYMOND SCHALK, PAUL ZACHARIAS, LEE EPLEN, the CITY OF CHICAGO, GAIL FEIGER and COOK COUNTY, awarding compensatory damages, attorneys' fees, and costs against each Defendant, punitive damages against each of the Individual Defendants, and any other relief that this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, FRANCISCO BENITEZ, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

**FRANCISCO BENITEZ**

BY:     s/ Anand Swaminathan
          *One of Plaintiff's Attorneys*

Elizabeth Wang                           Jon Loevy
LOEVY & LOEVY                        Anand Swaminathan
2060 Broadway, Ste. 460           Steven Art
Boulder, CO 80302                     Lauren Carbajal
O: 720.328.5642                        LOEVY & LOEVY
elizabethw@loevy.com              311 N. Aberdeen, 3rd Fl.
                                               anand@loevy.com
                                               O: 312.243.5900