**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| FRANCISCO BENITEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 23-cv-16896 |
| v. | ) | |
| | ) | Hon. Mary M. Rowland |
| JEROME BOGUCKI, RAYMOND | ) | |
| SCHALK, PAUL ZACHARIAS, LEE | ) | |
| EPLEN, the CITY OF CHICAGO, GAIL | ) | |
| FEIGER, and COOK COUNTY, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT FORMER ASA GAIL FEIGER'S ANSWER AND AFFIRMATIVE
DEFENSES TO PLAINTIFF'S COMPLAINT**

NOW COMES defendant, Former Cook County Assistant State's Attorney, GAIL

FEIGER, by and through her attorneys, TRIBLER ORPETT & MEYER, P.C., and for her Answer

and Affirmative Defenses to plaintiff, FRANCISCO BENITEZ's complaint, states as follows:

**INTRODUCTION**

1. Plaintiff Francisco Benitez was only 18 years old when he was arrested,

prosecuted, and wrongly convicted of the tragic 1989 shooting of Willaim Sanchez and Prudencio

Cruz. He spent 34 years in prison for a crime he did not commit.

**ANSWER: Defendant Feiger admits that Plaintiff was arrested, prosecuted and convicted**

**of the tragic 1989 shooting of William Sanchez and Prudencio Cruz. Defendant Feiger lacks**

**knowledge or information sufficient to form a belief as the age of Plaintiff. Defendant Feiger**

**denies the remaining allegations in Paragraph 1.**

2. Plaintiff had nothing to do with the murder. Not one piece of physical evidence

connected Plaintiff to the shootings. He had no motive to commit the crime. And he had a

1

strong alibi, vouched for by two women who were not related to Plaintiff and had no reason to lie for him.

**ANSWER: Defendant Feiger denies that Plaintiff had nothing to do with the murder. Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 2.**

3.      Instead, Plaintiff's arrest, prosecution, and conviction were based entirely on false evidence purposely manufactured by Chicago Police Detectives Jerome Bogucki and Raymond Schalk, in concert with the other Defendants.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 3.**

4.      Among the fabricated evidence were two identifications of Plaintiff by two witnesses who never even saw the shooting and got only a fleeting glimpse of a person running by their window after the shooting. In fact, the person that ran by their window was not the perpetrator, but one of the victims stumbling back home after being shot.

**ANSWER: To the extent that Paragraph 4 alleges conduct by Defendant Feiger, Defendant Feiger denies the allegation. Defendant Feiger lacks knowledge or information sufficient to form a belief as the truth of the remaining allegations in Paragraph 4**

5.      In addition, Defendants obtained a false confession from Plaintiff that they extracted through a psychologically abusive interrogation in which they repeatedly rejected Plaintiff's denials and his alibi, threatened him, and eventually promised him that if he signed a statement confessing to a version of events they provided to him, he could go home to his family.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 5.**

6.      The confession statement was obviously false. It was a bizarre, rambling story that did not comport with the known facts of the crime.

**ANSWER: Defendant Feiger denies the allegations contained in paragraph 6.**

7.      Defendants' promise that Plaintiff would be released if he signed the statement was also false. Instead, they charged Plaintiff with murder.

**ANSWER: Defendant Feiger admits Plaintiff was charged with the murder of William Sanchez and Prudencio Cruz and denies the remaining allegations in Paragraph 7.**

8.      Plaintiff was convicted based on false and fabricated evidence manufactured by Defendants. He spent the next three decades in prison.

**ANSWER: Defendant Feiger denies Plaintiff's conviction was based on false and fabricated evidence manufactured by Defendants. Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 8.**

9.      In August 2023, after an extensive evidentiary hearing in the Circuit Court of Cook County in which overwhelming evidence of Plaintiff's innocence was presented, including the identities of the true perpetrators of the crime (who had no relation to Plaintiff whatsoever), Plaintiff's conviction was thrown out and the State dropped all charges.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9.**

10.      Plaintiff has also been certified as an innocent person by the Circuit Court of Cook County.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10.**

3

11.     This is not the first time Defendants Bogucki and Schalk have caused the wrongful conviction of an innocent man. At least two other innocent men have had their convictions thrown out based on the investigative misconduct of these detectives.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 11 as said allegations are not directed towards Defendant Feiger. To the extent that an answer is required, Defendant Feiger is lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained herein.**

12.     A civil rights lawsuit filed by one of those men resulted in a jury finding that Defendant Bogucki had violated his constitutional rights, and one of the largest wrongful conviction verdicts in Illinois history.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 12 as said allegations are not directed towards Defendant Feiger. To the extent that an answer is required, Defendant Feiger is lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained herein.**

13.     Defendants Bogucki and Schalk were not rogue officers, but part of a culture of misconduct within the Chicago Police Department. These Defendants worked in the Area 5 Detective Division alongside a number of other notorious Chicago Police detectives, including Reynaldo Guevara and Ernest Halvorsen.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 13 as said allegations are not directed towards Defendant Feiger. To the extent that an answer is required, Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained herein.**

4

14. These Area 5 detectives are collectively responsible for approximately 50 wrongful convictions—so far—resulting in more than 400 years of wrongful incarceration of innocent Chicagoans.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 14 as said allegations are not directed towards Defendant Feiger. To the extent that an answer is required, Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained herein.**

15. Plaintiff now seeks justice for the harm that Defendants have caused and redress for the loss of liberty and the terrible hardship that he has endured and continues to suffer as a result of the Defendants' misconduct.

**ANSWER: To the extent that Paragraph 15 alleged conduct by Defendant Feiger, Defendant Feiger denies the allegations contained herein.**

## JURISDICTION AND VENUE

16. This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

**ANSWER: Defendant Feiger admits that Plaintiff brought this action pursuant to 42 U.S.C. § 1983 and Illinois Law. Defendant Feiger denies any alleged tortious conduct, denies Defendant Feiger deprived Plaintiff of his rights secured by the U.S. Constitution or Illinois Law denies Plaintiff is entitled to any relief and denies any remaining allegations contained herein.**

17. This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

**ANSWER: Defendant Feiger admits that Plaintiff seeks to invoke jurisdiction of the Court in the matter described in Paragraph 17, does not contest this Court's jurisdiction of Plaintiff's federal claims, denies that Defendant Feiger deprived Plaintiff of his rights secured by the U.S. Constitution or Illinois Law and denies any remaining allegations contained herein.**

18. Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's conviction.

**ANSWER: Defendant Feiger does not contest venue, but Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding where Plaintiff resides. Defendant Feiger denies that Plaintiff is entitled to any relief in this matter, denies Defendant Feiger deprived Plaintiff of his rights secured by the U.S. Constitution or Illinois Law and denies any remaining allegations contained herein.**

## PARTIES

19. Plaintiff Francisco Benitez spent 34 years wrongfully incarcerated for a crime he did not commit.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the number of years Plaintiff was incarcerated. Defendant Feiger denies the remaining allegations in Paragraph 19.**

20. At all times relevant to the events described in this Complaint, Defendants Jerome Bogucki, Raymond Schalk, and Paul Zacharias, and other unknown law enforcement officers were police officers in the Chicago Police Department, acting under color of law and

6

within the scope of their employment for the City of Chicago. These Defendants are referred to collectively as the "Police Officer Defendants" throughout this complaint.

**ANSWER: Defendant Feiger admits that Plaintiff refers to Jerome Bogucki, Raymond Schalk, and Paul Zacharias as "Police Officer Defendants" throughout his complaint. Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 20.**

21. At all times relevant to the events described in this complaint, Defendant Lee Epplen, and other unknown law enforcement officers supervised the Police Officer Defendants. These Defendants participated in the misconduct alleged in this complaint and also facilitated, condoned, approved, and turned a blind eye to the misconduct of the Defendants whom they supervised.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21.**

22. At all relevant times, Defendant Gail Feiger and unknown Cook County prosecutors were Assistant Cook County State's Attorneys. Prior to the existence of probable cause to believe Plaintiff had committed a crime, and while acting in their investigatory capacity, these Defendants manufactured and fabricated coerced confessions and statements from Plaintiff and other witnesses, and they worked to maliciously prosecute Plaintiff for the Cruz and Sanchez murders. These Defendants are referred to collectively as the "Prosecutor Defendants" throughout this complaint.

**ANSWER: Defendant Feiger admits that she was an Assistant State's Attorney with the Cook County State's Attorney's Office at the time Plaintiff was charged with murder. Defendant Feiger denies the remaining allegations in Paragraph 22.**

23.     The City of Chicago is an Illinois municipal corporation that is or was the employer of the above-named Defendants. Each of the Defendants named in this Complaint acted during their investigation of the Cruz and Sanchez murders as agents or employees of the City of Chicago. The City of Chicago is liable for all torts committed by the Defendants pursuant to the doctrine of *respondeat superior*. Additionally, the City of Chicago is responsible for the policies and practices of the Chicago Police Department.

**ANSWER: Defendant Feiger admits that the City of Chicago is a Illinois municipal corporation and that it is responsible for the policies and practices of the Chicago Police Department. Defendant Feiger denies that she was employed by the City of Chicago. Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 23.**

24.     Defendant Cook County is a governmental entity within the State of Illinois, which consists in part of its Cook County State's Attorney's Office and was at all relevant times the employer of the Prosecutor Defendants. Defendant Cook County is a necessary party to this lawsuit.

**ANSWER: Defendant Feiger admits that Cook County is governmental entity within the State of Illinois, which provides funding for the Cook County State's Attorney's Office. Defendant Feiger denies Cook County was her employer. Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 24.**

25.     Each and every individual Defendant, known and unknown, acted under color of law and within the scope of his employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his individual capacity unless otherwise noted.

**ANSWER: Defendant Feiger admits the individual Defendants are being sued in their individual capacities. Defendant Feiger admits that she acted within the scope of her employment and denies that she deprived Plaintiff of his rights secured under the U.S. Constitution or Illinois Law. Defendant Feiger denies any remaining allegations contained herein.**

## FACTS

### The Crime

26. On the night of April 28, 1989, at approximately 8:45 p.m., William Sanchez and Prudencio Cruz were walking north from their home at 1243 N. Harding Ave. to the corner store.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26.**

27. As they were walking north on Harding, just a few doors away from their homes, someone walked south from the corner of Potomac and Harding and shot at the two boys.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27.**

28. William Sanchez died almost immediately from a gunshot wound to the head, in front of 1253 N. Harding.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28**

29. Prudencio Cruz was shot in the right side of his chest. After being shot, he went back south, making it to the front steps of his family home at 1243 N. Harding, where his body was found.

9

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29.**

30.     Cruz and Sanchez were just 14 years old. Their deaths are a profound tragedy.

**ANSWER: Defendant Feiger admits that the deaths of Cruz and Sanchez were a profound tragedy. Defendant Feiger is lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 30.**

### Initial Investigation

31.     Moments before the shooting, two Chicago police officers encountered a group of four or more members of the ULOGs, the street gang that controlled that neighborhood, hanging out on the corner of Potomac and Harding. The officers told the group to disperse, and then drove away.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31**

32.     The shooting occurred moments later. In fact, the officers were close enough that they heard the shooting and returned to the scene to find both the bodies.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 32**

33.     When police canvassed the scene, they could not find anyone who actually witnessed the shooting.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33.**

34.     Two of the ULOGs the police had just dispersed told officers that they heard "Cookie" and "Fat Johnnie" might have had something to do with the shooting.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34**

35. Plaintiff has never gone by either of those names, was not from that neighborhood, and has no affiliation with the ULOGs.

**ANSWER: Defendant Feiger is lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 35.**

36. Mildred Cotto and Hipolito Rosado, who lived at 1247 N. Harding Ave, were eating dinner when they heard the gunshots, rushed to their window, and saw someone running southbound on Harding. They did not see the actual shooting, and they did not see the person running south with a gun.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 36.**

37. When Cotto and Rosado spoke to officers shortly after the shooting, they were only able to provide a basic description of the person they saw run by their window, but could not identify any distinct or distinguishing features. They did not tell police that the person they saw running by ever stopped, or that he looked their way, which was the only way they would have been able to actually see the shooter's face.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 37**

38. Indeed, given the circumstances of the shooting—occurring late at night, with dim street lighting, a viewing opportunity of just seconds to see a person running down the street past their window—Cotto and Rosado could not possibly or reliably identify any one person as being the person they saw run past their window.

11

**ANSWER: Defendant Feiger is lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38**

39. In sum, police investigators had early investigative leads pointing in two directions: (a) toward the ULOGs that had been on the corner just before and after the shooting; and (b) toward Cookie and Fat Johnnie (a lead that came from the ULOGs who had been at the corner). None of these leads pointed toward Benitez.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 39.**

### A Gang Crimes Officer Investigating Cookie's Involvement in the Crime Uses Benitez's Photo as a "Filler"

40. Veteran Gang Crimes Officer Joseph Sparks learned of the lead that Cookie was the perpetrator. Sparks knew Cookie and considered him a viable suspect in the shooting.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40.**

41. The day after the shooting, Sparks created a photo array in which he included a picture of Cookie as his suspect.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41.**

42. In order to create a fair photo array, Sparks needed "fillers," *i.e.*, photos of other individuals who were not suspects, but who had features sufficiently similar to the suspect (Cookie) and the witness descriptions in order to create a fair photo array.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42.**

43. Sparks included a picture of Plaintiff in the photo array as one of those fillers.

12

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43.**

44.     Sparks did not include Plaintiff in the photo array because he thought he was a suspect, or because he thought Plaintiff committed the crime.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44.**

45.     To the contrary, Sparks knew Plaintiff, and had interacted with him over the years. Sparks thought Plaintiff was a good kid and did not believe Plaintiff was the type of person who would commit such a crime.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45.**

46.     After selecting the picture of Plaintiff and others to include in the photo array as fillers, Sparks showed the photo array to Cotto, the witness who had seen the shooter run by her window. Instead of identifying Sparks' suspect, Cookie, the witness made a false identification: she identified Plaintiff, a mere filler.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46.**

47.     That Cotto identified one of the fillers in the photo array further demonstrated that Cotto did not, and could not, get a good look at the person running by her window.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47.**

48.     Indeed, witnesses often fail to identify a police suspect, and instead identify a filler. In studies of eyewitness memory, filler identifications are understood to be false

13

identifications. They are an indication that the witness is not able to make a reliable identification and may instead be guessing.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48.**

49. Unable to get an identification of Cookie, the police investigation stalled.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth allegations in Paragraph 49.**

50. Meanwhile, despite the fact that the shooting occurred just moments after a group of ULOGs were told to disperse from the corner, the Police Officer Defendants, under the supervision of Defendant Epplen, failed to conduct any investigation into the possible involvement of the ULOGs in the shooting.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50.**

### Defendants Bogucki and Schalk Decide to Rewrite History, Falsely Claiming Plaintiff Had Been a Suspect All Along

51. Defendants Bogucki and Schalk, rather than pursue promising leads regarding the ULOGs, decided to frame Plaintiff instead.

**ANSWER: To the extent that Paragraph 51 alleges conduct by Defendant Feiger, Defendant Feiger denies the allegations. Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 51.**

52. They wrote a police report falsely claiming that Plaintiff had been a suspect all along. They created a false narrative in which Cotto's photo array identification of Plaintiff, a *filler*, was actually an accurate identification of the police *suspect*.

14

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 52.**

53. Armed with this fabricated evidence, and Cotto's earlier mistaken identification of Plaintiff's picture, Defendants Bogucki and Schalk conducted lineups in which they got Cotto and Rosado to falsely identify Plaintiff as the person they saw run past their window.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53.**

54. Those identifications were false—Plaintiff had not been involved in the crime, or even in that neighborhood.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 54.**

55. The identifications were the product of manipulation and coercion by Defendants Bogucki and Schalk in order to frame Plaintiff for a crime he did not commit.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 55.**

56. Defendants Bogucki and Schalk wrote false police reports documenting their fabricated photo array identification and lineup identifications. Those false reports were prepared under the supervision of, and approved by, Defendant Epplen.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 56.**

57. To this day, Gang Crimes Officer Sparks maintains that he does not believe Plaintiff committed the crime, and that he has always felt the police got the wrong guy.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 57.**

### Defendants Ignore Plaintiff's Repeated Denials, and His Confirmed Alibi, Instead Obtaining a False Confession by Force

58. Knowing they needed more, on the afternoon of August 29, 1989, Defendants had Plaintiff arrested and brought in for questioning.

**ANSWER: To the extent that Paragraph 58 alleges conduct by Defendant Feiger, Defendant Feiger denies the allegation. Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 58.**

59. Defendants Bogucki and Schalk interrogated Plaintiff about the crime. Plaintiff told Defendants the truth: he was not involved in the shooting, and he knew nothing about the crime or who committed it.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 59.**

60. Plaintiff also provided Defendants with an alibi for his whereabouts. He had been at the home of a woman named Tomasa, who he affectionately referred to as his "Aunt," and was someone he would occasionally help with her daily needs and spend time with at her house.

**ANSWER: Defendant Feiger admits that Plaintiff initially denied involvement and claimed he had an alibi before confessing to the murders of Cruz and Sanchez. Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 60.**

61. Plaintiff explained that on the night of the shooting, just a day earlier, he had

received a check from work, gone to the mall with a friend and purchased various items, and then spent the evening at Tomasa's house with her and her daughter.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 61.**

62. Plaintiff was able to provide receipts that showed he had been at the mall.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 62.**

63. Defendants also learned that Tomasa confirmed Plaintiff's alibi.

**ANSWER: To the extent that Paragraph 63 alleges conduct by Defendant Feiger, Defendant Feiger denies the allegation. Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 63.**

64. To this day, Tomasa and her daughter maintain that Plaintiff had been with them that night, despite more than three decades of not speaking to or seeing Plaintiff.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 64.**

65. Defendants Bogucki and Schalk ignored Plaintiff's repeated denials, and the evidence that Plaintiff's alibi was confirmed by individuals who had no incentive to lie for him. They were hell-bent on charging Plaintiff and closing their case.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 65.**

66. Defendants continued their interrogation, and Plaintiff continued to deny any involvement in the crime.

17

**ANSWER: Defendant Feiger admits that Plaintiff initially denied involvement and claimed he had an alibi before giving a statement confessing to the murders of Cruz and Sanchez. Defendant Feiger denies she interrogated Plaintiff and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 66.**

67. When Defendant Feiger, the Assistant State's Attorney assigned to the case, interviewed Plaintiff that night, he continued to deny any involvement and provided the same alibi that he had repeatedly provided to Defendants Bogucki and Schalk.

**ANSWER: Defendant Feiger admits that Plaintiff initially denied involvement and claimed he had an alibi before giving a statement confessing to the murders of Cruz and Sanchez. Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 67.**

68. Defendant Feiger did not take a statement or otherwise document Plaintiff's several denials or alibi, despite the many hours he had already been in police custody.

**ANSWER: Defendant Feiger admits that Plaintiff initially denied involvement and claimed he had an alibi before giving a statement confessing to the murders of Cruz and Sanchez. Defendant Feiger denies the remaining allegations contained in Paragraph 68.**

69. Defendants Bogucki and Schalk then continued to interrogate Plaintiff overnight, applying increasingly coercive tactics.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 69.**

70. Defendants Bogucki and Schalk ignored his repeated denials of any involvement in the crime, calling him a liar over and over.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 70.**

71.     Defendants Bogucki and Schalk brandished a flashlight menacingly during the interrogation, as though Plaintiff was going to be hit if he did not cooperate.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 71.**

72.     Defendants Bogucki and Schalk kept Plaintiff in a locked interrogation room all night, without sleep.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 72.**

73.     Defendants Bogucki and Schalk refused his requests to speak to his mother.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 73.**

74.     Defendants Bogucki and Schalk fed him facts of the crime, which they would later deny and instead use to claim that Plaintiff's confession was legitimate.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 74.**

75.     And finally, Defendants Bogucki and Schalk falsely promised Plaintiff that if he agreed to sign a statement admitting to the shooting, but claiming he did it in self-defense, he would be released.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 75.**

19

76. Early the next morning, after many more hours of interrogation and experiencing the coercive tactics above, Plaintiff's will was finally broken. He was scared, afraid, and exhausted. In the hope that Defendants Bogucki and Schalk would keep their promise and he would go home if he did what they wanted, Plaintiff agreed to sign a statement parroting the story Defendants Bogucki and Schalk fed him.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 76.**

77. Defendants Bogucki and Schalk called Defendant Feiger back to Area 5 to again interview Plaintiff and to get him to sign a false statement implicating himself in the crime.

**ANSWER: Defendant Feiger admits that she returned to Area 5 at the request of the police and denies the remaining allegations in Paragraph 77.**

78. Defendant Feiger wrote out the false statement and had Plaintiff sign it.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 78.**

79. Defendants Bogucki, Schalk and Feiger worked together cooperatively and in coordination to obtain the false statement from Plaintiff.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 79.**

80. Defendant Feiger actively participated as an investigator with the Police Officer Defendants in the creation of Plaintiff's false statement incriminating himself, which he was forced to sign. Defendant Feiger met with Defendants Bogucki and Schalk before taking Plaintiff's statement and knew the story they wanted Plaintiff to say.

**ANSWER: Defendant Feiger denies the allegation in Paragraph 80.**

81. Indeed, the false statement taken by Defendant Feiger simply repeated what Defendants Bogucki and Schalk had told Plaintiff to say.

20

**ANSWER: Defendant Feiger denies the allegation in Paragraph 81.**

82. In fact, the statement attributed to Plaintiff consisted of Defendant Feiger walking Plaintiff through Defendants' version of events to have Plaintiff confirm that version of events. It was not an interview designed to get to the truth.

**ANSWER: Defendant Feiger denies the allegation in Paragraph 82.**

83. The story Defendants Bogucki, Schalk and Feiger walked Plaintiff through was bizarre and entirely contrary to the crime scene evidence and known facts about the crime. Crime scene and forensic evidence, among other things, made the story demonstrably false.

**ANSWER: Defendant denies the allegation in Paragraph 83.**

84. Defendant Feiger simply disregarded the evidence that clearly showed that Plaintiff's confession was false. Defendant Feiger also knew that Plaintiff had denied any involvement in the crime when she had interviewed him the night before, and that his bizarre confession was coming only after a whole night of additional interrogation by Defendants Bogucki and Schalk.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 84.**

85. She continued her interview of Plaintiff with the specific purpose of obtaining a false, incriminating statement from him.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 85.**

86. Plaintiff's statement—obtained by violence and psychological coercion and manufactured by Defendants—was used to prosecute and convict Plaintiff for a crime he did not commit.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 86.**

21

87. Defendant Zacharias joined the other Defendants' efforts to frame Plaintiff for a crime he did not commit.

**ANSWER: To the extent that Paragraph 87 alleges conduct by Defendant Feiger, Defendant Feiger denies the allegation. Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 87.**

88. In order to further implicate Plaintiff in the crime, and to corroborate the fantastical, false confession Defendants had obtained from him, Defendant Zacharias agreed to falsely claim that he went with Plaintiff to an alley near the shooting so that Plaintiff could show him where he discarded the murder weapon.

**ANSWER: To the extent that Paragraph 88 alleges conduct by Defendant Feiger, Defendant Feiger denies the allegation. Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 88.**

89. That never happened. Defendant Zacharias made it up.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 89.**

90. No gun was ever recovered.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 90.**

91. Defendants suppressed at all times the coercive techniques they used to obtain Plaintiff's statement. In addition, they suppressed that they had fabricated his statement.

**ANSWER: To the extent that Paragraph 91 alleges conduct by Defendant Feiger, Defendant Feiger denies the allegations. Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 91.**

92.     In addition, Defendants Bogucki and Schalk wrote a false closing report regarding their investigation, lying about how Plaintiff came to be implicated in the crime, the corroboration of Plaintiff's alibi, and the coercive tactics they used to secure Plaintiff's false confession.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 92.**

93.     The false report was prepared under the supervision of, and approved by, Defendant Epplen.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 93.**

### Evidence About the Real Killers

94.     In fact, the real killers were Mickey and Mono, two members of the ULOGs— whose members had been seen at the corner by police just moments before the shooting.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 94.**

95.     On the night of the shooting, two brothers, A.R. and S.G.[1], had been at their house a few doors down from where the shooting occurred. They were seated in the front window of their upstairs apartment and saw the whole thing.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 95.**

96.     They watched as Mickey and Mono walked south toward the two victims, who were walking north.

---

[1] The names are abbreviated to protect the privacy of third parties.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 96.**

97. A.R. and S.G. saw Mickey pull out a gun and shoot the two boys.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 97.**

98. Mickey then handed the gun to Mono, and they fled north on Harding.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 98.**

99. A.R. and S.G. knew Mickey and Mono and immediately recognized them. They saw Mickey and Mono in the neighborhood regularly and had even seen them outside earlier that day.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 99.**

100. Later, Mono even admitted to A.R. that Mono and Mickey had committed the crime. Mono said that he had seen A.R. in the window and knew he saw the shooting.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 100.**

101. A.R. and S.G. did not tell police what they had seen. They were both young at the time of the shooting, and afraid that if they ever said anything they would be killed by the ULOGs. Their mother even told them not to tell anyone for their own safety.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 101.**

24

102. For years, A.R. and S.G. did not know that Plaintiff, or anyone, was ever convicted of the crime.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 102.**

103. When they found out that Plaintiff had been in prison for decades for the crime, they came forward with the truth.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 103**

104. Based on the information provided by A.R. and S.G., the identifications made by Cotto and Rosado were obviously false. The shooters fled north after the shooting, and so the person who went south past Cotto and Rosado's window was not the perpetrator.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 104.**

105. Instead, the person Cotto and Rosado had seen going south past their window was one of the victims, Prudencio Cruz, the only person who definitively traveled south to the front steps of his home after the shooting.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 105.**

106. Cruz even matched the initial description Cotto and Rosado had given to the police.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 106.**

25

107. In addition, based on the information provided by A.R. and S.G., Plaintiff's confession was obviously false, and the product of Defendants' unlawful coercion.

**ANSWER: Defendant Feiger denies the confession was false, denies the confession was the product of unlawful coercion and denies the remaining allegations in Paragraph 107.**

### Plaintiff's Wrongful Conviction and Imprisonment

108. As a result of the Defendants' misconduct and based on the false evidence described in this Complaint, Benitez was arrested, prosecuted, and convicted of murder.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 108.**

109. There was no physical evidence of any kind linking Plaintiff to the crime.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 109.**

110. The case against Plaintiff was based entirely on the false and fabricated evidence discussed above, including Plaintiff's false confession, which was published to the jury.

**ANSWER: Defendant Feiger denies the allegation in Paragraph 110.**

111. At his criminal trial, Plaintiff took the stand, maintaining his absolute innocence and testifying to Defendants' misconduct.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 111.**

112. Without the false statements and confession Defendants created, and their suppression of evidence of Plaintiff's innocence, Plaintiff would have never been convicted.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 112.**

113. Instead, Plaintiff was found guilty of all charges. The State sought the death penalty.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 113.**

114. Plaintiff was spared the death penalty and was sentenced to life in prison.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 114.**

115. Plaintiff was just 18 years old at the time of his arrest. The following decades of his life were consumed by the horror of wrongful imprisonment.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 115.**

116. Because of the Defendants' misconduct, Plaintiff's opportunity to grow older with his family and make a life with them was taken away. Plaintiff's relationships with his family were severely harmed. He could not have and raise children.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 116.**

117. Plaintiff was stripped of his young adulthood and deprived of opportunities to gain an education, to engage in meaningful labor, to develop skills and a career, and to pursue his interests and passions.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 117.**

118. Plaintiff has been deprived of all the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being. He never knew whether the truth would come out or if he would ever be exonerated.

**ANSWER: Defendant Feiger denies the allegation in Paragraph 118.**

119. Plaintiff spent decades in prison before being released. In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, the Defendants' misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, rage, and other physical and psychological effects.

**ANSWER: Defendant Feiger denies teh allegation in Paragraph 119.**

120. Plaintiff was branded a murderer. He has suffered profound reputational harm as a result.

**ANSWER: Defendant Feiger denies the allegation in Paragraph 120**

**Plaintiff's Exoneration**

121. Benitez never stopped fighting to prove his innocence, even after his conviction.

**ANSWER: Defendant Feiger denies Plaintiff is innocent. Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 121.**

122. In June 2022, Plaintiff filed a Petition for Post-Conviction Relief. His Petition included signed affidavits from A.R. and S.G. and presented evidence of Defendants Bogucki and Schalk's misconduct in this case and others.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 122.**

123. On August 29, 2023, after an evidentiary hearing to consider Plaintiff's Petition and the evidence of his innocence, the Cook County Circuit Court vacated Plaintiff's conviction on the grounds of actual innocence.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 123.**

28

124.    The State entered a motion of *nolle prosequi* and dismissed all charges against Plaintiff.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to from a belief as to the truth of the allegations in Paragraph 124.**

125.    On December 7, 2023, Plaintiff received a certificate of innocence from the State of Illinois.

**ANSWER: Defendant Feiger lacks knowledge or information sufficient to from a belief as to the truth of the allegations in Paragraph 125.**

126.    At the time of his exoneration, Plaintiff had been wrongfully imprisoned for more than 34 years. He had spent almost two-thirds of his life in prison as an innocent man.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 126.**

### Chicago's Policy and Practice of Wrongly Convicting Innocent Persons in Violation of the Constitution

127.    The City of Chicago and the Chicago Police Department are responsible, by virtue of their official policies, for inflicting miscarriages of justice in scores of criminal cases like the one endured by Plaintiff.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 127 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

128.    Since the 1980s, more than a hundred cases have come to light in which Chicago police officers fabricated false evidence and/or suppressed exculpatory evidence in order to cause the convictions of innocent persons for serious crimes they did not commit.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 128 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

129. These cases include many in which Chicago police officers used the same tactics that Defendants employed against Plaintiff in this case, including but not limited to fabricating evidence, concealing exculpatory evidence, coercing confessions and statements through physical and psychological abuse, manipulating witnesses in order to influence eyewitness identifications and testimony, and using other tactics to secure the arrest, prosecution, and conviction of a person without probable cause and without regard for the person's actual guilt or innocence.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 129 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

130. At all relevant times, members of the Chicago Police Department, including the Defendants in this action, routinely fabricated and manipulated identification procedures to procure suspect identifications that they knew to be inaccurate.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 130 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

131. At all relevant times, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the Chicago Police Department and

never disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 131 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

132.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 132 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

133.    The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of, inter alia, *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, No. 87 C 2536 (N.D. Ill.).

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 133 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

134.    The policies and practices of file suppression at issue in *Fields* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the investigation at issue here.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 134 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

135. In addition, a set of clandestine files related to Area Five homicides—the same Detective Division involved in this case—was found in the case of *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.). Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 135 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

136. The policy and practice of suppressing exculpatory and/or impeaching material evidence was alive and well at all relevant times, including at the Area Five Detective Division during the investigation at issue here.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 136 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

137. In addition, the City of Chicago and the Chicago Police Department routinely used illegal tactics, including torture, physical coercion, and psychological coercion, to extract involuntary and false confessions and statements from suspects and witnesses. There are well over 250 documented cases of Chicago Police officers using torture and coercion to illegally obtain confessions in homicide cases. The City had notice of this widespread practice of procuring false and coerced confessions long before the events at issue in this case.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 137 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

138. This history goes back at minimum to the 1980s and has continued well into the 2000s and includes the conduct of infamous Chicago Police Detectives including Jon Burge, Michael McDermott, Kenneth Boudreau, Kriston Kato, and many others. In many cases, these and other Chicago Police officers have been the subject of judicial determinations that they engaged in a pattern and practice of using physical and psychological abuse to coerce false confessions from suspects, and/or the exonerations resulted from DNA evidence proving the confessions were false, and/or the exonerations resulted in the State of Illinois certifying that the individual was innocent despite an earlier false confession.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 138 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

139. Moreover, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 139 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

140. Prior to and during the period in which Plaintiff was falsely charged and convicted, the City of Chicago also operated a dysfunctional disciplinary system for Chicago

police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 140 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

141.	For instance, Defendants Bogucki, Schalk, and Zacharias worked with infamous Chicago Police officers including Reynaldo Guevara, responsible so far for more than forty overthrown wrongful convictions, and Joseph Miedzianowski, who is now serving a life sentence in federal prison for his role as leader of a criminal drug enterprise operated out of the Chicago Police Department.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 141 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

142.	Multiple witnesses have come forward with evidence that detective Guevara used his status as a detective to advance the criminal drug enterprise he participated in with Miedzianowski, and to pressure drug dealers that did not do their bidding. Guevara's assistance included working with Miedzanowski to pin murders on innocent men.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 142 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

143.    In the case of *Klipfel v. Bentsen*, No. 94 C 6415 (N.D. Ill), a federal jury in Chicago returned a *Monell* verdict against the City, finding that the City was responsible for maintaining a code of silence and a deeply flawed disciplinary system that allowed Chicago police officers (operating out of the very same police facilities as the Defendant Officers in this case) to operate a far-reaching, long-running criminal enterprise that included the subversion of homicide investigations.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 143 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

144.    The *Klipfel* plaintiffs were two former federal agents from the Bureau of Alcohol, Tobacco and Firearms who brought allegations of rampant criminal misconduct among Gang Crimes officers to the attention of CPD officials. The evidence in that litigation included: Philip Cline, an Area Commander and future Chief of Detectives and Superintendent, personally filed two Internal Affairs complaints against Miedzianowski for tampering in homicide investigations, that resulted in no discipline whatsoever; and that Raymond Risley, an assistant deputy superintendent and head of Internal Affairs, not only knew about misconduct in homicide cases but actively participated in efforts to subvert the disciplinary investigation into Miedzianowski that was at the heart of the Klipfel litigation.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 144 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

145.    As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department,

35

which has been acknowledged by leaders of the Chicago Police Department and elected officials in Chicago. In accordance with the code of silence, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 145 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

146. The Code of Silence is so pervasive that, as in this case, it often involves other law enforcement officers and agencies, like the Felony Review Unit of the Cook County State's Attorney's Office.

**ANSWER: Defendant Feiger denies the allegation in Paragraph 146.**

147. As a result of the City of Chicago's established practices, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse circumstances. The practices that enable this belief include failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 147 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

148. By way of example, Area 5 detective Reynaldo Guevara—who worked alongside Defendants Bogucki and Schalk for years—has a long history of engaging in the kind of investigative misconduct that occurred in this case. There are dozens of known cases in which Guevara and other Chicago police officers engaged in serious investigative misconduct similar to that described above. They engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 148 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

149. As of the filing of this complaint, more than forty men and women have had their convictions thrown out because of Defendant Guevara's misconduct. They are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Arturo DeLeon-Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, Geraldo Iglesias, Demetrius Johnson, David Gecht, Richrd Kwil, Ruben Hernandez, Juan Hernandez, Rosendo Hernandez, Ray Munoz, David Lugo, Carlos Andino, Daniel Rodriguez, Jaime Rios, Jose Cruz, Marilyn Mulero, Nelson Gonzalez, Johnny Flores, Adolfo Rosario, Eruby Abrego, Jeremiah Cain, Edwin Davila, Alfredo Gonzalez, Gamalier Rivera, Madeline

Mendoza, Louis Robinson and John Martinez. These men and women served hundreds of years in prison for crimes they did not commit.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 149 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

150. The long history of misconduct Guevara has been found to have engaged in is precisely the same kind of investigative misconduct that occurred in this case, including obtaining false eyewitness identifications through manipulated identification procedures, manipulating witnesses, fabricating evidence, suppressing exculpatory evidence, and coercing false confessions and false statements from suspects and witnesses using physical and psychological violence, all in the course of maliciously prosecuting innocent persons

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 150 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

151. Given this extensive history of misconduct and the City of Chicago's failure to meaningfully supervise or discipline officers like Guevara and others, it is apparent that Defendants engaged in such misconduct because they had every reason to believe that the City of Chicago and its Police Department condoned such behavior.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 151 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

152. The City of Chicago and its Police Department also failed in the years prior to the Plaintiff's wrongful conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

   a. The conduct of live lineup, photographic, and other identification procedures.

   b. The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

   c. The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

   d. The risks of wrongful conviction and the steps police officers should take to minimize risks.

   e. The risks of engaging in tunnel vision during investigation.

   f. The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 152, including sub parts a-f, as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

153. The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Plaintiff's wrongful conviction and his injuries.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 153 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

154. The City's failure to train, supervise, and discipline its officers, including the Police Officer Defendants, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and de facto policies, as alleged above.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 154 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

155. The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 155 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

156. The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

40

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 156 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

157.    The policy and practice of the City of Chicago is so well-established that it has important ramifications for misconduct in the Felony Review Unit ("FRU") of the Cook County State's Attorney's Office, which often includes young attorneys who are part of the investigation in CPD Detective Divisions and work alongside police officers. As a consequence, the misconduct and coordination between the Defendant Officers and Defendant Feiger during the investigation in this case was not unique or isolated. Instead, members of the FRU as a matter of widespread custom and practice, routinely facilitate and cooperate in fabricating and coercing confessions from suspects in the custody of the Chicago Police Department and then fail to disclose exculpatory evidence to attorneys in their own Trial Division.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 157.**

158.    The manner in which the CCSAO staffs the Felony Review Unit also reinforces systemic and symbiotic misconduct. In particular, the CCSAO typically staffs the FRU with new, young prosecutors. Those prosecutors are quickly taught that they have to be "team players" and go along with the actions of the CPD Detectives, even if their actions involve misconduct. The FRU attorneys know that their time in the unit has the potential to "make or break" their careers, giving them an incentive to go along with the Detectives, because performance in the FRU is a steppingstone to getting to the Trial Division of the SAO.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 158.**

159.    Then, by the time young prosecutors get into the Trial Division, who need to secure convictions to get promoted, prosecutors have little opportunity or incentive expose

41

police misconduct, even when they see it, because doing so will make police officers unwilling to serve as witnesses in their cases because they are not "team players," and would potentially expose their own misconduct.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 159.**

### Defendants Bogucki and Schalk's History of Framing Innocent Persons

160.    This is not the first case in which Defendants Bogucki and Schalk were found to have engaged in misconduct during the course of a homicide investigation. Instead, they acted consistently with the pattern of misconduct discussed above, which occurred persistently within the Chicago Police Department generally, and Area 5 specifically.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 160 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

161.    By way of example, Defendant Bogucki has been found liable by a federal jury for framing 13-year old Thaddeus Jimenez for a murder by suppressing evidence related to Defendants Bogucki and Schalk's manipulation of eyewitness identifications. Indeed, after the jury's verdict finding him liable, Defendant Bogucki admitted to his misconduct under oath.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 161 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

162.    The testimony about investigative misconduct in *Jimenez* is extensive, and appalling:

      a.  Larry Tueffel testified that Bogucki and Schalk yelled at him and forced him to identify Jimenez. 13-year old Tueffel was taken to the police station at 3 a.m.,

42

where he made clear that the shooter was not Jimenez. When Larry refused to implicate Jimenez, detectives Bogucki and Schalk threatened to arrest Larry and send him to jail. They continued to badger him and tell him he was a liar until he finally gave up from exhaustion and agreed to falsely implicate Jimenez.

b. Tina Elder, another witness, testified that Bogucki and Schalk showed her two photographs when they brought her into the police station: one of the dead victim, and another of Jimenez. When Bogucki and Schalk showed her these photographs, they told her that Thaddeus Jimenez was their primary suspect, thereby tainting the line-up they later conducted.

c. Two to three days after the murder for which Jimenez was later wrongly convicted, a person named Juan Carlos was secretly tape-recorded confessing to the murder. This tape was then given to Bogucki and Schalk by a defense lawyer for one of the suspects. Instead of properly investigating this confession, Bogucki and Schalk declined to take any genuine steps to investigate Juan Carlos's confession, and they never logged the tape recording into evidence.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 162, including subparts a-c, as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

163. Based on the ample evidence of Bogucki and Schalk's misconduct, Jimenez was awarded $25 million by a federal jury. That verdict was upheld on appeal. *See Jimenez v. City of Chicago*, 732 F.3d 710, 712 (7th Cir. 2013).

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 163 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

164. In addition, Bogucki and Schalk led the investigation of a 1990 shooting that resulted in the wrongful conviction of James Fletcher. Fletcher's conviction was thrown out on October 25, 2019, when his habeas corpus petition was granted by a federal district judge. The Attorney General's Office chose not to appeal the decision, and the Cook County State's Attorney's Office dropped all charges on January 30, 2020.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 164 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

165. Detectives Bogucki and Schalk's misconduct during the course of that investigation included the following:

    a. Emmett Wade was an eyewitness to the shooting for which Fletcher was convicted. When he was interviewed by Bogucki and Schalk, he was shown a single photograph of Fletcher. The detectives told Wade that the man in the photograph was a "bad guy" they wanted to keep off the street. Despite pressure, Wade did not identify Fletcher. This exculpatory information—an eyewitness to the crime did not identify Fletcher—was omitted from Bogucki and Schalk's police reports and deliberately concealed.

    b. Eyewitness Sheenee Friend was interviewed by Bogucki and Schalk while in custody for a parole violation on March 9, 2002. At the interview, she was shown a photo-array. When asked to identify the person who killed the victim, Friend

44

pointed to someone other than Fletcher. In response, Bogucki and Schalk moved her finger to Fletcher's photo and told her that was who did it. The detectives also told Friend that Fletcher was a bad, violent man, that needed to be kept off the streets. The unlawful tactics used with Friend were not included in police reports and deliberately concealed by Bogucki and Schalk.

c. When eyewitness Edward Cooper was interviewed by Bogucki and Schalk, he was shown a photo-array which contained a photograph of Fletcher. Cooper told the detectives that he did not recognize anyone in the pictures. But Bogucki and Schalk wrote a false police report concealing this information, and instead stated that Cooper made a tentative identification of Fletcher as the perpetrator.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 165, including subparts a-c, as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

166. In her ruling, the Honorable Rebecca Pallmeyer of the United States District Court for the Northern District of Illinois wrote that the sworn statements of eyewitnesses Wade, Friend and Cooper about Bogucki and Schalk's misconduct were "highly troubling," and noted that they were so "particularly in light of the misconduct for which Detective Schalk was charged and Detective Bogucki was found liable in *Jimenez v. City of Chicago*.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 166 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

167. Finally, Defendant Bogucki was accused of physically coercing Corky Terry into a false confession in 2002. Bogucki interrogated Terry, during which Terry repeatedly denied

45

all involvement in the shooting. Bogucki then physically abused Terry until he agreed to give a videotaped statement admitting he committed the shooting. This physical abuse included kicking, punching, grabbing by the hair, and hitting Terry with a phonebook.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 167 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

168. Defendants never received discipline from the City of Chicago or the Chicago Police Department for any of the conduct set out above.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 168 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

169. In fact, the City of Chicago failed to supervise or discipline its police officers, including Defendants. Defendants engaged in the misconduct set forth in this complaint because they knew that the City of Chicago and its Police Department tolerated and condoned such conduct.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 169 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

**COUNT I**
**42 U.S.C. § 1983 – Due Process**
**(Fourteenth Amendment)**

**Defendant Feiger makes no answer to Count I, as Court I is not directed against Defendant Feiger. To the extent any allegations contained within Count I could be interpreted or construed as stating implying, asserting, or alleging wrongdoing of any kind, or liability of any kind in reference to Defendant Feiger, such allegations are denied.**

**COUNT II**

**42 U.S.C. § 1983 – Coerced and False Confession**
**(Fifth and Fourteenth Amendments)**

182.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

**ANSWER: Defendant Feiger restates and incorporates her answers to each Paragraph of Plaintiff's complaint as though fully set forth herein.**

183.     In the manner described more fully above, the Police Officer Defendants and the Prosecutor Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, and others unknown, as well as under color of law and within the scope of their employment, forced Plaintiff to make false statements involuntarily and against his will, which incriminated him and which were used against him in criminal proceedings, in violation of his rights secured by the Fifth and Fourteenth Amendments.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 183.**

184.     In addition, the Police Officer Defendants and the Prosecutor Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used extreme psychological coercion in order to force Plaintiff to incriminate himself falsely and against his will in a crime he had not committed, in violation of his right to due process secured by the Fourteenth Amendment. This misconduct was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 184**

185.     In addition, these Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, as well

47

as under color of law and within the scope of their employment, fabricated a false confession, which was attributed to Plaintiff and used against Plaintiff in his criminal proceedings, in violation of Plaintiff's right to a fair trial protected by the Fourteenth Amendment.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 185**

186. Specifically, these Defendants conducted, participated in, encouraged, advised, and ordered an unconstitutional interrogation of Plaintiff, using unlawful coercion, which overbore Plaintiff's will, and resulted in him making involuntary statements implicating himself in the murder of Sanchez and Cruz.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 186**

187. Those false incriminating statements were wholly fabricated by these Defendants and attributed to Plaintiff. Those false incriminating statements were used against Plaintiff to his detriment throughout his criminal case. They were the reason that Plaintiff was prosecuted and convicted of the Cruz murder.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 187.**

188. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 188.**

189. As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 189.**

190. The misconduct described in this Count by the Police Officer Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 166 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

## COUNT III
### 42 U.S.C. § 1983 – Malicious Prosecution and Unlawful Detention
### (Fourth and Fourteenth Amendments)

191. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

**ANSWER: Defendant Feiger restates and incorporates her answers to each Paragraph of Plaintiff's complaint as thought fully set forth therein.**

192. In the manner described above, the Police Officer Defendants and the Prosecutor Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 192.**

193. In so doing, these Defendants maliciously prosecuted Plaintiff and caused Plaintiff to be deprived of his liberty without probable cause and to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

49

**ANSWER: Defendant Feiger denies the allegations in Paragraph 193.**

194.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 194.**

195.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 195.**

196.    The misconduct of the Police Officer Defendants described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 166 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

**COUNT IV**
**42 U.S.C. § 1983 – Failure to Intervene**

197.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

**ANSWER: Defendant Feiger restates and incorporates her answers to each Paragraph of Plaintiff's complaint as though fully set forth therein.**

198.    In the manner described above, during the constitutional violations described herein, one or more of the Police Officer Defendants and the Prosecutor Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 198.**

199.     These Defendants had ample, reasonable opportunities as well as the duty to prevent this harm but failed to do so.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 199.**

200.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 200.**

201.     As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 201.**

202.     The misconduct of the Police Officer Defendants described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

**ANSWER: Defendant Feiger makes no response to the allegations contained in Paragraph 202 as said allegations are not directed at Defendant Feiger. To the extent that an answer is required, such allegations are denied.**

## COUNT V
### 42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights

**Defendant Feiger makes no answer to Count V, as Court V is not directed against Defendant Feiger. To the extent any allegations contained within Count I could be interpreted or construed as stating implying, asserting, or alleging wrongdoing of any kind, or liability of any kind in reference to Defendant Feiger, such allegations are denied.**

## COUNT VI
### 42 U.S.C. § 1983 – Policy and Practice Claim against the City of Chicago

**Defendant Feiger makes no answer to Count VI, as Court VI is not directed against Defendant Feiger. To the extent any allegations contained within Count I could be**

**interpreted or construed as stating implying, asserting, or alleging wrongdoing of any kind, or liability of any kind in reference to Defendant Feiger, such allegations are denied.**

**COUNT VII**
**State Law Claim – Malicious Prosecution**

222.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

**ANSWER: Defendant Feiger restates and incorporates her answers to each Paragraph of Plaintiff's complaint as though fully set forth therein.**

223.    In the manner described above, the Police Officer Defendants and the Prosecutor Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 223.**

224.    In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 224.**

225.    The judicial proceedings were terminated in Plaintiff's favor and in a manner indicative of his innocence when his conviction was vacated and charges against him were dropped in September 2023.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 225.**

226.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 226.**

227.    As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 227.**

## COUNT VIII
### State Law Claim – Intentional Infliction of Emotional Distress

228.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

**ANSWER: Defendant Feiger restates and incorporates her answers to each Paragraph of Plaintiff's complaint as though fully set forth therein.**

229.    The actions, omissions, and conduct of the Police Officer Defendants and the Prosecutor Defendants as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 229.**

230.    As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER: Defendant Feiger denies the allegations in Paragraph 230.**

## COUNT IX
### State Law Claim – Willful and Wanton Conduct

**Defendant Feiger has moved contemporaneously to dismiss Count IX pursuant to Fed Rule 12(b)(6) and therefore makes no Answer thereto.**

## COUNT X

53

**State Law Claim – Civil Conspiracy**

**Defendant Feiger makes no answer to Count X, as Court X is not directed against Defendant Feiger. To the extent any allegations contained within Count X could be interpreted or construed as stating implying, asserting, or alleging wrongdoing of any kind, or liability of any kind in reference to Defendant Feiger, such allegations are denied.**

### COUNT XI
**State Law Claim – *Respondeat Superior***

**Defendant Feiger makes no answer to Count XI, as Court XI is not directed against Defendant Feiger. To the extent any allegations contained within Count XI could be interpreted or construed as stating implying, asserting, or alleging wrongdoing of any kind, or liability of any kind in reference to Defendant Feiger, such allegations are denied.**

### COUNT XII
**State Law Claim – Indemnification**

**Defendant Feiger makes no answer to Count XII, as Court XII is not directed against Defendant Feiger. To the extent any allegations contained within Count XII could be interpreted or construed as stating implying, asserting, or alleging wrongdoing of any kind, or liability of any kind in reference to Defendant Feiger, such allegations are denied.**

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

### Absolute Prosecutorial Immunity

At all relevant times, Defendant Feiger was an Assistant State's Attorney for the Cook County State's Attorneys' Office. In this capacity, Defendant Feiger evaluated whether criminal charges should have been filed against certain individuals. When Defendant Feiger spoke with suspects or witnesses, took statements, and ultimately determined whether criminal charges should be approved, she performed acts toward initiating a prosecution and presenting the State's case against those other persons. Because the conduct complained of on the part of Defendant Feiger arises out of the evaluation of evidence and taking statements for the purpose of initiation and prosecution of criminal charges, Plaintiff's claims are barred on the basis of absolute

54

prosecutorial immunity, and therefore, all claims against Defendant ASA Feiger should be dismissed with prejudice.

### Second Affirmative Defense

### Qualified Immunity

At all relevant times, Defendant Feiger was an Assistant State's Attorneys for the Cook County State's Attorney's Office. To the extent any of her actions are not protected by absolute prosecutorial immunity, she is protected by qualified immunity as her actions did not violate Plaintiff's constitutional rights and were at all times proper in light of clearly established law. A reasonable government official objectively viewing the facts and circumstances then confronting Defendant Feiger could have reasonably believed that the actions taken by her were objectively reasonable and were within constitutional limits that were clearly established at the time.

### Third Affirmative Defense

### Sovereign Immunity

Plaintiff's claims against Defendant Feiger are really claims against a State official based upon her actions as an Assistant State's Attorney, functions that fall within the scope of her employment and authority as an Assistant State's Attorney. Plaintiff's claims against Defendant Feiger relate to the initiation of charges against, and the criminal prosecution of, Plaintiff. The State's Attorney is the constitutional officer vested with exclusive discretion in the initiation and management of a criminal prosecution. The prosecution of Plaintiff's case is, therefore, well within the scope of the State's Attorney's authority. Plaintiff's claims against Defendant Feiger are against the State of Illinois, and thus sovereign immunity shields Defendant Feiger from liability in federal court. The Illinois Court of Claims has sole and exclusive jurisdiction over Plaintiff's state law claims against Defendant Feiger.

55

## Fourth Affirmative Defense

### Statute of Limitations

Plaintiff's state law claims accrued more than one year earlier than the filing of Plaintiff's Complaint and, thus, these claims are time-barred under 745 ILCS 10/8-101.

## Fifth Affirmative Defense

### Statute of Limitations

Plaintiff's §1983 claims accrued more than two years earlier than the filing of Plaintiff's Complaint and, thus, these claims are time-barred.

## Sixth Affirmative Defense

### Tort Immunity Act 745 ILCS 10/2-201

Defendant Feiger is immune from Plaintiff's state law claims under 745 ILCS 10/2-201 of the Illinois Tort Immunity Act which provides as follows: "Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused."

## Seventh Affirmative Defense

### Tort Immunity Act 745 ILCS 10/2-202

The acts or omissions that Defendant Feiger allegedly took would have been acts or omissions in her capacity as a public employee in the execution or enforcement of a law and because those acts or omissions did not constitute willful or wanton conduct, Defendant Feiger is immune from suit.

## Eighth Affirmative Defense

### Tort Immunity Act 745 ILCS 10/2-204

56

Because Defendant Feiger was, at all times relevant to the Plaintiff's complaint, a public employee acting within the scope of his employment, she is immune from suit for any injury caused by the act or omission of another person.

### Ninth Affirmative Defense

### Tort Immunity Act 745 ILCS 10/2-205

Defendant Feiger is not liable for any injury caused by their adoption of an enactment, failure to adopt an enactment, or their enforcement or failure to enforce any law.

### Tenth Affirmative Defense

### Tort Immunity Act 745 ILCS 10/2-208

Defendant Feiger is not liable for injury caused by her instituting or prosecuting any judicial or administrative proceeding within the scope of her employment, unless she acts maliciously and without probable cause.

### Eleventh Affirmative Defense

### Tort Immunity Act 745 ILCS 10/2-213

Defendant Feiger is immune from punitive or exemplary damages under 745 ILCS 10/2-213 which provides as follows: "Notwithstanding any other provision of law, a public employee is not liable to pay punitive or exemplary damages in actions brought against the employee based on an injury allegedly arising out of an act or omission occurring within the scope of employment of such an employee serving in a position involving the determination of policy or the exercise of discretion when the injury is the result of an act or omission occurring in the performance of any legislative, quasi-legislative or quasi-judicial function, even though abused."

### Twelfth Affirmative Defense

### Good Faith

Defendant Feiger always acted in good faith and in furtherance of lawful objectives.

## Thirteenth Affirmative Defense

### Failure to Mitigate Damages

Plaintiff has failed to mitigate damages he claims to have sustained.

## Fourteenth Affirmative Defense

### Res Judicata, Collateral Estoppel, and Judicial Estoppel

Plaintiff's claims in the Complaint are barred by the doctrines of res judicata, collateral estoppel, and judicial estoppel to the extent that they involve issues, claims, or statements, that were, or could have been, resolved in the underlying criminal or post-conviction proceeding, or were asserted during said proceedings.

## Fifteenth Affirmative Defense

### Attorney Fees

Plaintiff is not entitled to attorney fees for his state law claims. See *Kerns v. Engelke*, 76 Ill.2d 154, 166 (Ill. 1979).

## JURY DEMAND

Defendant Gail Feiger hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

s/ William B. Oberts
Special State's Attorney for
defendant, Gail Feiger

William B. Oberts - #6244723
Kevin C. Kirk -  # 6329937
Tribler Orpett & Meyer, P.C.
225 W. Washington St., Suite 2550
Chicago, IL 60606
(312) 201-6400
wboberts@tribler.com
kckirk@tribler.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of Defendant, Gail Feiger's, **Answer and Affirmative Defenses to Plaintiff's Complaint** was served upon:

<table>
<tr><td>

***Attorneys for Plaintiff***
Elizabeth C. Wang
Loevy & Loevy
2060 Broadway, Suite 460
Boulder, CO 80302
720-328-5642
elizabethw@loevy.com
martinez@loevy.com – Assistant Lilia

Lauren Carbajal
Anand
Swaminathan
Loevy & Loevy
311 N Aberdeen Street 3rd Floor
Chicago, IL 60607
(312) 243-5900
carbajal@loevy.com
anand@loevy.com

***Attorneys for Jerome Bogucki, Lee Epplen,***
***Raymond Schalk, Paul Zacharias***
Steven Blair Borkan
Timothy P Scahill
Misha Itchhaporia
Kathryn E. Boyle
Molly E. Boekeloo
Borkan & Scahill, Ltd.
20 S. Clark Street, Suite 1700
Chicago, IL 60603
sborkan@borkanscahill.com
tscahill@borkanscahill.com
mitchhaporia@borkanscahill.com
kboyle@borkanscahill.com
mboekeloo@borkanscahill.com

</td><td>

***Attorneys for Cook County***
Kelli Huntsman
Christopher P. Nugarus
Cook County State's Attorney's Office
500 Richard J. Daley Center - Fifth Floor
Chicago, IL 60602
312-603-5527
kelli.huntsman@cookcountyil.gov
christopher.nugarus2@cookcountysao.org

***Attorneys for City of Chicago***
Terrence M. Burns
Daniel M. Noland
Paul A. Michalik
Katherine C. Morrison
Dhaviella N. Harris
Daniel J. Burns
Reiter Burns LLP
311 S. Wacker Dr., Suite 5200
Chicago, IL 60606
(312) 982-0090
tburns@reiterburns.com
dnoland@reiterburns.com
pmichalik@reiterburns.com
kmorrison@reiterburns.com
dburns@reiterburns.com
dharris@reiterburns.com

</td></tr>
</table>

service was accomplished pursuant to ECF as to Filing Users and complies with LR 5.5 on the 16th day of February, 2024.

s/ William B. Oberts
an Attorney